A-469-815
Remand
Court No. 24-00162
POR:  06/01/2022 – 05/31/2023
**Public Document**
E&C/OVI:  Team

*ULMA Forja, S. Coop. v. United States*,
**Court No. 24-00162 (CIT December 16, 2025)**
**Finished Carbon Steel Flanges from Spain**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

**I.    SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court

or CIT), in *ULMA Forja, S.Coop. v. United States*, Court No. 24-00162, issued on December 16,

2025 (*Remand Order*).[1]  This action arises out of the *Final Results* in the antidumping duty (AD)

administrative review of finished carbon steel flanges (flanges) from Spain.[2]  The period of

review (POR) is June 1, 2022, through May 31, 2023.[3]

After considering comments submitted by parties and further analyzing the record, for the

purposes of these final results of redetermination, pursuant to the Court's *Remand Order*,

Commerce has reconsidered its application of the Cohen's *d* test as part of its differential pricing

analysis.  As a result of our analysis, we have revised ULMA Forja S. Coop's (ULMA) margin

calculations from the *Final Results*.  These revisions resulted in a weighted-average dumping

margin for ULMA of 1.89 percent.

---

[1] *See ULMA Forja S.Coop v. United States*, Court No. 24-00162 (CIT December 16, 2025) (*Remand Order*)
[2] *See Finished Carbon Steel Flanges from Spain:  Final Results of Administrative Review; 2022-2023*, 89 FR 60862
(July 29, 2024) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[3] *Id.*

## II.    BACKGROUND

In the *Final Results*, Commerce calculated a weighted-average dumping margin for ULMA based on application of the alternative average-to-transaction (A-to-T) comparison methodology.[4]  ULMA challenged Commerce's use of the Cohen's *d* test in its decision to apply the A-to-T method in the *Final Results* before this Court.  The Court ordered a redetermination[5] so that Commerce could bring its differential pricing analysis into concordance with *Marmen*.[6]

In *Marmen*, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) held that it is unreasonable for Commerce to use the Cohen's *d* test as part of its differential pricing analysis when the test is applied to data that do not satisfy the statistical criteria of normal distribution, equal variability, and equally and sufficiently numerous.[7]  In doing so, the Federal Circuit held that "Commerce may re-perform a differential pricing analysis, and that analysis may not rely on Cohen's *d* test for data sets like those here {*i.e.*, the data underlying the differential pricing analysis in the Marmen investigation that the Federal Circuit found do not conform to the three statistical criteria}," but it also held that Commerce may develop and justify a different analytical approach for evaluating whether price differences among purchasers, regions, or time periods are significant.[8]  Consequently, in *Stupp*, the Federal Circuit remanded "to Commerce, which may re-perform a differential pricing analysis without relying on Cohen's *d*."[9]  On December 16, 2025, the Court ordered remand in this case for Commerce to reconsider its differential pricing analysis in light of *Stupp*, *Mid Continent*, and *Marmen*.[10]

---

[4] *See Final Results*.
[5] *See Remand Order*.
[6] *See Marmen Inc., et al. v. United States*, 134 F.4th 1334 (Fed Cir. 2025) (*Marmen*).
[7] *Id.* at 1338; *see also Stupp Corp. v. United States*, 2025 U.S. App. LEXIS 9616 (Fed. Cir. 2025) (non-precedential) (*Stupp*); *Mid Continent Steel & Wire, Inc. v. United States*, 2025 U.S. App. LEXIS 31306 (Fed. Cir. 2025) (*Mid Continent*).
[8] *See Marmen*, 134 F.4th at 1338 (*emphasis added*).
[9] *See Stupp*, 2025 U.S. App. LEXIS 9616, at 8.
[10] *See Remand Order*.

III.    ANALYSIS

I.    **Commerce's Application of the Cohen's *d* Test**

Following the Federal Circuit's decisions in *Marmen* and *Stupp*, Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under section 777A(d)(1)(B)(i) of the Tariff Act of 1930, as amended (the Act), to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods.[11]  To comply with the Federal Circuit's holding, Commerce discontinued the use of the Cohen's *d* test in administrative proceedings and adopted a new test for evaluating whether price differences among purchasers, regions, or time periods are significant.[12]  Additionally, and concurrent with this change, Commerce also discontinued the use of the "mixed method" in administrative proceedings.  In its revised differential pricing analysis, Commerce adopted the "price difference test" as part of its differential pricing analysis to determine whether prices differ significantly.  Accordingly, for these final results of redetermination, in light of Commerce's revised approach in administrative proceedings pursuant to "all relevant law," including the Federal Circuit's decision in *Marmen*, and in accordance with this Court's *Remand Order*, Commerce reconsidered and discontinued its application of the Cohen's *d* test to ULMA's U.S. sales data, and, in the alternative, applied the "price difference test," as detailed below.

---

[11] *See Alternatives to the Use of Cohen's d; Request for Comment,* 90 FR 21277 (May 19, 2025).
[12] *See, e.g., Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 FR 30050 (July 8, 2025), and accompanying IDM at 2-5; *Certain Corrosion-Resistant Steel Products from the United Arab Emirates:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 90 FR 42226 (August 29, 2025), and accompanying IDM at Comment 2.

### i.    Comparisons to Normal Value

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to determine whether ULMA's sales of the subject merchandise from Spain to the United States were made at less than normal value (NV), Commerce compared the export price (EP) to the NV as described in the "Export Price" and "Normal Value" sections of the *Preliminary Results*.[13]

### 1.    Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates a weighted-average dumping margin by comparing weighted-average NVs to weighted-average EPs (or constructed export price {CEP}) (*i.e.*, the average-to-average (A-to-A) method) unless Commerce determines that another method is appropriate in a particular situation.  In a less-than-fair-value (LTFV) investigation, Commerce examines whether to compare weighted-average NVs with the EPs (or CEPs) of individual sales (*i.e.*, the A-to-T method) as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.

In numerous investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the A-to-T method is appropriate in a particular situation, consistent with 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.  Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method here.  Commerce will continue to evaluate its approach in this area based on comments received and the application of the differential pricing analysis on a case-by-case basis, and on Commerce's additional

---

[13] *See Carbon Steel Flanges from Spain:  Preliminary Results of Antidumping Duty Administrative Review and Rescission of Review in Part; 2022-2023*, 89 FR 40465 (May 10, 2024) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 4-7.

experience with addressing the potential masking of dumping that can occur when Commerce uses the A-to-A method in calculating a respondent's weighted-average dumping margin.

The differential pricing analysis used here examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods. The analysis evaluates all U.S. sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists. If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the A-to-A method to calculate the weighted-average dumping margin. The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise. Purchasers are based on the reported consolidated customer codes. Regions are defined using the reported destination code (*i.e.*, ZIP code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the POR based upon the reported date of sale. For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number (CONNUM) and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP (or CEP) and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "price difference test" is applied to determine whether prices differ significantly. For comparable merchandise, the price difference test examines whether the weighted-average net price to a given purchaser, region, or time period is within two percent of the weighted average net price to all other purchasers, regions, or time periods. If the weighted-average net price to the given purchaser, region, or time period falls outside of the plus or minus two percent band around the weighted-

average net price to all other purchasers, regions, or time periods, then the prices to that given purchaser, region, or time period are found to differ significantly and those sales to the given purchaser, region, or time period pass the price difference test.

Next, the "ratio test" assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the POR. If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-to-T method. If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the POR. Consequently, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-to-A method and using the alternative A-to-T method.

If both tests in the first stage (*i.e.*, the price difference test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that the A-to-T method could be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-to-A method can account for such differences. In considering this question, Commerce examines whether using the A-to-T method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method. If the difference between the two calculations is meaningful, then this demonstrates that the A-to-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-to-T method may be appropriate. A difference in the weighted-average dumping margins is considered

meaningful if:  (1) there is a 25 percent relative change in the weighted-average dumping margins between the A-to-A method and the A-to-T method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the A-to-T method move across the *de minimis* threshold.

## 2.    Results of the Differential Pricing Analysis

For ULMA, based on the results of the differential pricing analysis, Commerce finds that 88.49 percent of the value of U.S. sales pass the price difference test,[14] and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Further, Commerce determines that the A-to-A method cannot account for such differences because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the A-to-A method and when calculated using the A-to-T method.  Thus, for these final results of redetermination, Commerce is applying the A-to-T method to calculate the weighted-average dumping margin for ULMA.

## IV.    INTERESTED PARTY COMMENTS

On January 26, 2026, Commerce issued its Draft Redetermination and provided interested parties an opportunity to comment.[15]  Commerce received comments from ULMA.[16] ULMA questions the statistical validity and the reasonability of the results of Commerce's price difference test.  After considering these comments, we have made no changes to our analysis for these final results of redetermination.  We respond to ULMA's comments below.

---

[14] *See* Memorandum, "Draft Remand Analysis Memorandum for ULMA Forja S. Coop," dated January 26, 2026, at 3.

[15] *See* Draft Results of Redetermination, *ULMA Forja S. Coop. v. United States*, Court No. 24-00162 (CIT 2025)

[16] *See* ULMA's Letter, "ULMA Forja, S. Coop's Comments on the Department's Draft Redetermination on Remand," dated February 9, 2026 (ULMA's Draft Redetermination Comments).

**Issue 1:  Whether the Price Difference Test is a Reliable Measure of "Significance"**

The following is a verbatim executive summary of argument submitted by ULMA.  For further details, *see* ULMA's Draft Redetermination Comments at 6-8.[17]

> The draft redetermination treats price differences between each test and base group as "significant" within the meaning of the statute if the average price to each group differs by more than two percent.  The Department previously abandoned this test after using it just one time, concluding that the test was not reliable.  In returning to this test, the Department makes no effort in its draft redetermination to justify this reversal in Department position despite its clear burden to do so.  Far from any reasonable explanation, the Department is simply silent.  The lack of any explanation as to why the previously unreliable two-percent test has somehow now suddenly become reliable and reflects the requirements of the statute is unlawful.  The Department is therefore bound by its prior findings and cannot apply the two-percent test here.

**Commerce's Position:**  We disagree with ULMA's arguments which conflate the two-percent (P/2) test with the price difference test that Commerce applied for the instant redetermination.  We disagree with ULMA that Commerce cannot use the price difference test simply because Commerce had previously determined that the P/2 test was not a "reliable indicator" that targeted dumping has occurred.

Commerce has never adopted the P/2 test as part of the differential pricing analysis.  The P/2 test and the price difference test are not equivalent to each other.  The P/2 test examined whether the weighted-average of U.S. prices of allegedly "targeted" sales were at least two percent lower than the weighted-average of U.S. prices of non-targeted sales with the stated aim of identifying "targeted dumping."  As discussed below, the P/2 test was the basis for the petitioner's targeted dumping allegation in *CFS from Korea Final*.[18]  Given Commerce's lack of experience at that time in addressing section 777A(d)(1)(B) of the Act, Commerce relied on the

---

[17] Internal citations removed for each of ULMA's comments.
[18] *See Notice of Final Determination of Sales at Less Than Fair Value:  Coated Free Sheet Paper from the Republic of Korea*, 72 FR 60630 (October 25, 2007) (*CFS from Korea Final*), and accompanying IDM at Comment 1.

petitioner's analysis in that investigation.[19]  However, in the following LTFV investigations in which the petitioner submitted a similar targeted dumping allegation, Commerce developed its own analysis to address section 777A(d)(1)(B) of the Act, *i.e.*, the "*Nails* test."[20]

In contrast, the price difference test examines whether U.S. prices differ significantly among purchasers, regions, and time periods.  Specifically, the price difference test examines whether the weighted-average U.S. price to a given purchaser, region, or time period is within two percent of the weighted average U.S. price to all other purchasers, regions, or time periods.  If the difference between the two weighted-average prices is within two percent of the weighted-average U.S. price to all other purchasers, then the sale prices to the individual purchaser, region, or time period do not differ significantly.  Alternatively, if the difference is two percent or greater, or two percent or less, then the sale prices to the individual purchaser, region, or time period do differ significantly.

The only common aspect of the P/2 test and the price difference test is the two percent threshold.  However, the P/2 test only examines whether prices to alleged "targets" are at least two percent lower than the prices for all other sales, whereas the price difference test considers whether prices to each purchaser, region, or time period are at least two percent higher or lower than the prices for all other sales.  The price difference test shares the two percent threshold with the arms-length test (with the same four percent band around the price), which is the basis for whether the prices of comparison market sales made to an affiliate are at arm's length.[21]  Thus, the price difference test is simply a different test than the P/2 test.

---

[19] *Id.*

[20] *See Certain Steel Nails from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 33977 (June 16, 2008) (*Nails from China Final*), and accompanying IDM.

[21] *See Preliminary Determination* PDM at 14.

Commerce now has substantially more experience addressing the provisions of section 777A(d)(1)(B) of the Act than it did in April 2007, when the petitioner submitted a targeted dumping allegation based on the P/2 analysis.[22]  In *CFS from Korea Final*, Commerce accepted petitioner's "P/2 test" to examine whether use of an alternative comparison method was permitted and addressed the petitioner's targeted dumping allegation.[23]  Subsequently, in the final determination in *Nails from China*,[24] Commerce explained:

> Prior to {the *CFS from Korea Final*}, {Commerce's} only experience with analyzing targeted dumping in an antidumping duty investigation was the case-specific analysis in the court remand that followed the antidumping investigation of certain pasta from Italy (*see Borden, Inc., Gooch Foods, Inc., and Hershey Foods Corp. v. United States*, Slip Op. 99-50, CIT, June 4, 1999), also referred to as the "Pasta Test."  The petitioner's allegations of targeted dumping in {*CFS from Korea Final*} presented {Commerce} with a host of issues that it had not previously confronted.  Given the short time available in that proceeding to address these issues, {Commerce} stated:
>
>> In the years since the Pasta Test was developed, {Commerce} has had no further experience analyzing targeting and we are examining how the Pasta Test standards and thresholds could be modified in developing a standard practice for addressing targeting allegations. In view of {Commerce's} uncertainty regarding the general applicability of the Pasta Test standards, the overall lack of case precedent on this matter, and the unique circumstances of this case, {Commerce} accepts the petitioner's targeting allegation without endorsing the petitioner's test standards and procedures as a general practice.[25]
>
> At the same time, {Commerce} signaled its intention to develop a standardized targeted dumping test to replace the P/2 test for application in subsequent investigations. Thus, while allowing the petitioner's targeted dumping allegation to proceed to conclusion in {*CFS from Korea Final*}, {Commerce} simultaneously announced in {*CFS from Korea Final*} at Comment 2 that it would develop "a new, more standardized test" (*i.e.*, a replacement for the P/2 test) through a proceeding

---

[22] *See Coated Free Sheet Paper from the Republic of Korea:  Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*,72 FR 30766, 30767 (June 4, 2007) (*CFS from Korea Prelim*).

[23] *See Notice of Final Determination of Sales at Less Than Fair Value:  Coated Free Sheet Paper from the Republic of Korea*, 72 FR 60630 (October 25, 2007) (*CFS from Korea Final*), and accompanying IDM; *see also CFS from Korea Prelim*, 72 FR at 30766.

[24] *See Nails from China Final* IDM.

[25] *See CFS from Korea Final* at Comment 2.

open to public input, which we initiated simultaneously with the publication of {*CFS from Korea Final*}. *See* {*Targeted Dumping in Antidumping Investigations; Request for Comment*, 72 FR 60651 (October 25, 2007)}.[26]

As such, Commerce introduced a new analysis, what became known as the *Nails* test, to examine whether the statutory requirements under section 777A(d)(1)(B) were satisfied.[27]  Afterwards, Commerce would replace the *Nail* test with a methodology called the "differential pricing analysis."[28]  Specifically, Commerce stated:

> While the *Nails* test is a statutorily consistent and statistically sound methodology for identifying whether the {A-to-T} method might be appropriate, {Commerce} has continued to seek to refine its approach with respect to the use of an alternative comparison method. Given {Commerce's} experience over the last several years, and based on {Commerce's} further research, analysis and consideration of the numerous comments and suggestions on what guidelines, thresholds, and tests should be used in determining whether to apply an alternative comparison method based on the {A-to-T} method, {Commerce} is developing a new approach for determining whether application of such a comparison method is appropriate in a particular segment of a proceeding pursuant to 19 CFR 351.414(c)(1) and consistent with section 777A(d)(1)(B) of the Act.  The new approach is referred to as the "differential pricing" analysis, as a more precise characterization of the purpose and application of section 777A(d)(1)(B) of the Act.[29]

After performing the differential pricing analysis since 2013, Commerce has continued to gain experience in addressing the statutory requirements provided under section 777A(d)(1)(B) of the Act.  With the issuance of the mandate following *Marmen*,[30] Commerce introduced the price difference test to determine whether prices for comparable merchandise differ significantly among purchasers, regions, or time periods.  In contrast to the P/2 test described above, the price difference test examines whether U.S. prices differ significantly among purchasers, regions, and

---

[26] *See Nails from China Final* IDM at 8-9.

[27] *See, e.g., Certain Steel Nails from the People's Republic of China:  Preliminary Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances and Postponement of Final Determination*, 73 FR 3928 (January 23, 2008) (*Nails from China Prelim*); and *Nails from China Final* IDM.

[28] *See Differential Pricing Analysis; Request for Comments*, 79 FR 26720, 26722 (May 9, 2014) (*Differential Pricing Analysis*); and *Xanthan Gum From the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013).

[29] *See Differential Pricing Analysis*, 79 FR at 26722.

[30] *See Marmen*, 134 F.4th at 1343-1348.

11

time periods.  Specifically, the price difference test examines whether the weighted average U.S. price to a given purchaser, region, or time period is within two percent of the weighted average U.S. price to all other purchasers, regions, or time periods.  If the difference between the two weighted-average prices is within two percent of the weighted-average U.S. price to all other purchasers, then the sale prices to the individual purchaser, region, or time period do not differ significantly.  Alternatively, if the difference is two percent or greater, or two percent or less, then the sale prices to the individual purchaser, region, or time period do differ significantly. The only common aspect of the P/2 test and the price difference test is the two percent threshold. However, the P/2 test only examines whether prices to alleged "targets" are at least two percent lower than the prices for all other sales, whereas the price difference test considers whether prices to each purchaser, region, or time period are at least two percent higher or lower than the prices for all other sales.  The price difference test does not stipulate an absolute value as a threshold (*e.g.*, $5 per kilogram) but a threshold that measures relative differences (*i.e.*, a percentage) on a case-by-case basis by a comparison to case- and product-specific averages dependent upon the customer, region, and temporal data provided by the respondent, specific to the period under examination and to the merchandise and, thus, the market under consideration.

Additionally, Commerce finds that two percent is a reasonable threshold to determine measure of significance.  The CIT has held that the language in section 777A(d)(1)(B) of the Act affords Commerce flexibility to implement a test that it deems appropriate to identify significant price differences.[31]  A two-percent threshold is a reasonable measure of significance, is used by Commerce in other contexts, and is consistent with other aspects of Commerce's practice in AD proceedings.  For example, in the arm's-length test conducted pursuant to 19 CFR 351.403(c),

---

[31] *See Garg Tube Export LLP v. United States*, 740 F.Supp.3d 1355, 1366 (CIT 2024) (*Garg Tube*).

Commerce finds that sales between affiliated parties in the comparison market are not at arm's length and fall outside the ordinary course of trade if the average, product-specific, comparison market prices to an affiliated customer are not within a range of 98 percent to 102 percent of the average, product-specific, comparison market prices to unaffiliated customers (*i.e.*, a plus or minus a two-percent difference from the weighted-average price to unaffiliated customers).  In fact, Commerce has found that average prices to an affiliated customer that differ by two percent or more, and, therefore, fail the arm's-length test, "differ significantly" from market prices.[32] When the prices to an affiliated customer are to not at arm's length, Commerce finds that such sales are outside of the ordinary course of trade.  The distinction between being within or outside of the ordinary course of trade is a significant difference, as sales which are found to be outside the ordinary course of trade are excluded from Commerce margin calculations, *e.g.*, excluded from the calculation of NV.

Moreover, pursuant to sections 733(b)(3) and 735(a)(4) of the Act, the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation is two percent. In other words, an estimated weighted-average dumping margin of at least two percent is significant, and not zero, whereas an estimated weighted-average dumping margin that is less than two percent, *i.e.*, *de minimis*, results in a determination that sales are not at LTFV. Commerce has synonymously referred to non-*de minimis* levels of dumping as a "significant" amount of dumping.[33]  If a weighted-average difference of two percent between U.S. prices and

---

[32] *See Large Diameter Welded Pipe from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 84 FR 6382 (February 27, 2019), and accompanying IDM at Comment 4 ("the prices at issue differ significantly from the prices charged to an unaffiliated company (*i.e.*, they are not within 98 to 102 percent of the price charged for or by an unaffiliated party), which leads us to conclude that these prices are affected by the relationship between Borusan and Borusan Logistik")).

[33] *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 26401 (June 6, 2019), and accompanying IDM at Comment 2 ("Under scenario (4), there is a significant (*i.e.*, non-*de minimis*) amount of dumping...").

NV is significant enough to warrant an affirmative determination of sales at LTFV, then it is reasonable to conclude that a two-percent price difference is significant within the context of section 777A(d)(1)(B)(i) of the Act.  Furthermore, in an administrative review, the *de minimis* threshold is one half of one (0.5) percent, which suggests that the two percent threshold from investigations is more conservative and indicates a level of significance that is much greater than the level of significance when the assessment of antidumping duties are at issue.[34]

Therefore, Commerce finds that our history of using different tests does not preclude the adoption of the price difference test as part of the revised differential pricing analysis used in these final results of redetermination.

**Issue 2:  Whether the Price Difference Test is a Correct Interpretation of the Statute**

The following is a verbatim executive summary of argument submitted by ULMA.  For further details, *see* ULMA's Draft Redetermination Comments at 8-13.

> Under the ordinary meaning of the key statutory term "pattern," it is not sufficient for the Department merely to identify price differences among purchasers, regions, or time periods — which is what the Department's test does.  Rather, the Department must demonstrate, based on the evidence, that any observed price differences form some discernible structure and are not just random price variations.
>
> The structure of 19 U.S.C. § 1677f-1(d)(1)(B) reinforces the conclusion based on the statutory text that "pattern" is an independent substantive requirement, not a mechanical trigger satisfied by numeric thresholds.  The statute establishes a two-step inquiry, which are separate and cumulative conditions:  (1) Commerce must first determine whether a pattern of significant price differences exists; and (2) Commerce must then explain why such differences cannot be taken into account using the average-to-average (A-A) method.  Interpreting "pattern" to mean nothing more than a very narrow price dispersion, as the Department's two-percent test does, unlawfully collapses the statute's two-step framework into a single mechanical inquiry.

---

[34] *See* 19 CFR 351.106(c) (providing that, in an administrative review, Commerce will treat as *de minimis* any weighted-average dumping margin that is less than 0.5 percent and will liquidate without regard to antidumping duties all entries during the relevant period of review, but antidumping duties will be collected if the weighted-average dumping margin is 0.5 percent or more).

The legislative history confirms that Congress sought to address deliberate pricing practices that mask dumping, not ordinary or random price variations. The SAA does not reference numerical thresholds or specific percentages, nor does it suggest that the Department may dispense with identifying a pricing practice or strategy in favor of a purely mechanical test.

Given the plain meaning, structure of the statute, and legislative history, the Department itself acknowledged that the statute requires an analysis that ensures its ability to reasonably distinguish between patterns on the one hand, and random chance on the other.

The Department's prior acknowledgement is consistent with the CAFC's opinion in *Marmen*, which held that any differential pricing analysis under the statue must be "justified as sound for gauging differences in the data sets at issue." The CAFC also invited the Department to continue its pursuit of statistical analysis to serve the purpose of the statute, including use of "some of the ideas underlying Cohen's analysis of group differences."

Because Commerce's two-percent price difference test fails to give effect to the statutory term "pattern," it is contrary to law and cannot support the application of the average-to-transaction comparison method in this remand redetermination.

**Commerce's Position:** ULMA's claim that the price difference test is an inapposite means of detecting a pattern displays ULMA's misunderstanding of the mechanics of Commerce's differential pricing analysis.[35] The price difference test determines whether prices differ significantly. The ratio test determines whether there is a pattern. The ratio test is consistent with the ordinary meaning of the word "pattern," which is "a frequent or widespread incidence."[36] Therefore, more than 33 percent of the value of ULMA's U.S. sales must pass the price difference test before Commerce determines that there is a pattern. As such, if 33 percent or less of the sales value for the U.S. sales pass the price difference test, then Commerce will find that there is no evidence that a pattern exists. These definitions support Commerce's

---

[35] *See* ULMA's Draft Redetermination Comments at 21.
[36] *See* Pattern, Merriam-Webster Online Dictionary, available at
https://www.merriamwebster.com/dictionary/pattern (last visited December 2, 2025).

approach because the ratio test quantifies the extent of the significant price differences.[37]  The

Federal Circuit has upheld the ratio test as a reasonable method for addressing the pattern

requirement of section 777A(d)(1)(B)(i) of the Act and has held that Commerce "has discretion

to determine a reasonable methodology to implement the statutory directive."[38]  The Federal

Circuit has also rejected the argument that the statute requires Commerce "to determine the

reasons why there is a pattern of export prices for comparable merchandise that differs

significantly among purchasers, regions, or time periods{.}"[39]  The Federal Circuit agreed with

the CIT that there is no intent requirement in the statute and that requiring Commerce to

determine intent of targeted dumping "would create a tremendous burden on Commerce that is

not required or suggested by the statute."[40]

In *Dillinger*,[41] the Federal Circuit addressed arguments that Commerce's ratio test fails to

implement the pattern requirement because Commerce aggregates prices found to differ among

different purchasers, different regions, and different time periods, into a single pattern.  In

construing section 777A(d)(1)(B) of the Act, the Federal Circuit held that Commerce's

"aggregation" methodology is a proper interpretation of the pattern requirement.  Moreover, the

courts have long acknowledged that "or" can mean "and."[42]

Under the ratio test, a pattern is found to exist if more than 33 percent of the sales value is

found to be prices that differ significantly.  Therefore, by arguing that the price difference test

---

[37] *See, e.g., Large Residential Washers from Mexico:  Final Results of Antidumping duty Administrative Review; 2018-2019*, 85 FR 81450 (December 16, 2020).

[38] *See Stupp*, 5 F. 4th at 1354.

[39] *See JBF RAK LLC v. United States*, 790 F. 3d 1358, 1368 (Fed. Cir. 2015) (*JBF RAK*); *see also Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 608 Fed. Appx. 948, 949 (Fed. Cir. 2015) (non-precedential); and *Nan Ya Plastics Corp., Ltd. v. United States*, 128 F.Supp.3d 1345 (CIT 2015).

[40] *See JBF RAK*, 790 F.3d at 1368.

[41] *See Dillinger France S.A. v. United States*, 981 F.3d 1318, 1325-26 (Fed. Cir. 2020) (*Dillinger*).

[42] *See, e.g., United States v. Moore,* 613 F.2d 1029, 1040 (D.C. Cir. 1979); and *De Sylva v. Ballentine*, 351 U.S. 750, 573 (1956).

instead of the ratio test fails to find a "pattern," ULMA demonstrates its misunderstanding of the

mechanics of Commerce's differential pricing analysis, thereby rending its arguments

meritless.[43]

**Issue 3:    Whether the Price Difference Test Yields Unreasonable Results for this
Administrative Record**

The following is a verbatim executive summary of argument submitted by ULMA.  For

further details, *see* ULMA's Draft Redetermination Comments at 13-24.

> Even if the statute conveyed broad discretion, the Department's two percent price
> difference test applied to this record would still fail because it produces illogical
> results inconsistent with the concept of a "pattern" and inconsistent with the notion
> of differences that are "significant."  The key is to show that the differences are
> meaningful, which under the statute means they form some "pattern" (and are not
> just random variation) and that they differ "significantly" (and not just some small
> and insignificant differences).
>
> As applied to this record the Department's two-percent price difference test is
> unreasonable in at least four different ways:
>
> - The test fails to adopt a reasonable standard to determine the universe of
>   eligible observations and instead tests even when there is a single
>   observation;
> - The test treats small and symmetrical differences from the mean as
>   somehow meaningful;
> - The test applies a fixed framework even when the specific facts indicate
>   that the framework does not fit the facts; and
> - The test adopts an unreasonable strict threshold of 2 percent that ignores
>   the degree of variability in the underlying data.
>
> Any one of these failures renders the determination here flawed.  Collectively, they
> show the Department's determination here is deeply flawed and has no reasonable
> basis.

**Commerce's Position:**  We disagree.  ULMA's claim that the price difference test is an illogical

means of detecting a pattern continues to display ULMA's misunderstanding of the mechanics of

Commerce's differential pricing analysis.[44]  ULMA, in making its arguments, insists that each of

---

[43] *See* ULMA's Draft Redetermination Comments at 8-13.
[44] *See* ULMA's Draft Redetermination Comments at 13-24.

the tests Commerce carries out as a part of its differential pricing analysis must satisfy all of the statutory requirements individually, rather than wholistically.[45]  For example, one of ULMA's arguments focuses on how the price difference test does not properly test for a pattern of prices. This misconstrues how the price difference test only examines whether prices differ significantly among purchasers, regions, or time periods.  The statute requires that Commerce determine whether there is a "pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time" and, subsequently, explain "why such differences cannot be taken into account" using the A-to-A method.  Commerce has thus constructed a three-part test to determine whether the statutory criteria have been met to permit Commerce to resort to the A-to-T method on a case-by-case basis.  The price difference test determines whether prices differ significantly.  The ratio test determines whether there is a pattern, as explained above.  The meaningful difference test determines whether the differences arising out of the respondent's pricing behavior in the U.S. market can be accounted for by the A-to-A method.  Thus, while ULMA argues that the price difference test fails to properly determine whether a pattern of prices exists, it is the ratio test that determines whether there is a pattern.

We further disagree with ULMA that Commerce's "recycled two-percent test" is unreliable in finding a pattern because it considers only a small number of transactions.[46] Previously, for the Cohen's $d$ test, Commerce required a minimum of two observations for the test and comparison groups to avoid calculating a value of zero for the group's standard deviation when there was only one observation in a group.  However, the price difference test does not require the calculation of a standard deviation.  Indeed, there is similarly no such

---

[45] *Id.* at 9-10.
[46] ULMA's Draft Redetermination Comments at 14-16.

requirement in the arm's-length test that the sales of comparable merchandise to the affiliated customer or to all unaffiliated customers have a minimum number of sales.  Moreover, it is possible for there to be one sale to a particular customer, region, or within a particular time period the price of which is significantly different than the prices for all other sales.  It is irrelevant whether there are at least two observations in each test or comparison group for the price difference test, which uses an analysis based on different calculations than in the Cohen's *d* test.  Again, ULMA misunderstands the mechanics of Commerce's price difference test, and thus, makes obsolete arguments that are no longer relevant as Commerce no longer uses the Cohen's *d* test.  ULMA briefly references a similar statistical argument regarding the "family-wise" error, however this offhand argument again relies on a flawed premise.  Commerce's price difference test does not look for statistical correlations.  Instead, the price difference test determines whether the weighted-average net price to a given purchaser or region, or during a specific time period, falls outside of the plus or minus two percent band around the weighted-average net price of sales to all other purchasers, regions, or time periods.  Commerce's price difference test is not a statistical analysis of sampled data where a false positive would indicate a violation of the null hypothesis or where any other type of statistical inference is inherent in the analysis.  No inferences are drawn that the analyzed data is representative of an unknown value.  As such, ULMA's reference to a "family-wise" error, which is relevant to statistical correlation, is not applicable here.

Next, ULMA argues that the price difference test erroneously treats small and symmetrical differences from the mean as meaningful.[47]  As explained above, the two percent threshold is used as a measure of significance in other aspects of Commerce's margin

---

[47] *See* ULMA's Draft Redetermination Comments at 16-18.

calculations, including in the arm's-length test and the *de minimis* threshold for an estimated

weighted-average dumping margin in an investigation.  When the prices to an affiliated customer

are not at arm's length, Commerce finds that such sales are outside of the ordinary course of

trade.  The distinction between being within or outside of the ordinary course of trade is a

significant difference, as sales which are found to be outside the ordinary course of trade are

excluded from Commerce's margin calculations, *e.g.*, excluded from the calculation of NV.

Likewise, the two-percent threshold in an investigation determines whether the investigation

results in an affirmative determination of sales at LTFV.  If a weighted-average difference of two

percent between U.S. prices and NV is significant enough to warrant an affirmative

determination of sales at LTFV, then it is reasonable to conclude that a two-percent difference in

U.S. prices—*the same U.S. prices that are used in comparison with NV*—is significant within the

context of section 777A(d)(1)(B)(i) of the Act.  We disagree that there it is a "matter of basic

mathematics" that prices will vary across purchasers, regions, or time periods such that the two-

percent threshold cannot serve as a valid measure of significance.[48]  The argument that prices

inherently vary and, thus, Commerce must accommodate such variations in measuring whether

there is a significant difference in prices is merely a reskinning of the argument that the two

percent threshold is insufficient.  Again, in making this argument, ULMA conflates the "differs

significantly" language with the "pattern" language contained in the statute.  In carrying out the

price differences test, Commerce is only looking for whether prices differ significantly among

purchasers, regions, or time periods.  Whether some individual sale prices fall within the two-

percent threshold range does not properly account for what Commerce is looking for through the

differential pricing analysis as a whole:  masked dumping that the A-to-A method cannot account

---

[48] *See* ULMA Draft Redetermination Comments at 16-17.

for.  By comparing the average of a test group to the average of a base group, Commerce can determine whether there is a significant difference between the average prices between groups amongst purchasers, regions, or time periods, consistent with its statutory directive.  Thus, ULMA's argument that Commerce's price difference test erroneously treats "small and symmetrical" differences as significant fails to support why Commerce's price difference test cannot serve as a reasonable measure of significance.

Further, ULMA argues that the price difference test fails to take into account case specific facts in determining whether prices differ significantly among purchasers, regions, or time periods, and that the two percent threshold is an unrealistic threshold.  Commerce's price difference test conforms with Congress' intent that Commerce determines whether prices differ significantly on a "case-by-case basis."[49]  The SAA states that, "in determining whether a pattern of significant price differences exist, Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product but not for another."[50]  As explained above under, Commerce's "price difference test" examines whether the weighted-average net price to a given purchaser, region, or time period is within two-percent of the weighted-average net price to all other purchasers, regions, or time periods.  Thus, whether the prices to a given purchaser, region, or time period differ significantly is determined relative to the weighted-average net price to all other purchasers, regions, or time periods.  As a result, the data on which Commerce relies in performing the price difference test changes on a case-by-case basis, i.e., specific to the respondent's pricing of comparable merchandise to all other purchasers, regions, or time periods, and Commerce's analysis therefore conforms with

---

[49] See section 777A(d)(1)(B) of the Act; see also Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 316, 103d Cong., 2d Session (1994) (SAA) at 843.
[50] See SAA at 843.

Congress' intent that an analysis of whether a pattern of prices exists be carried out on a case-by-case basis.

Lastly, we disagree with ULMA's argument that the price difference test uses an "unreasonably strict threshold."[51]  As an initial matter, the price difference test does not stipulate an absolute value as a threshold (*e.g.*, $5 per kilogram) to define "differ significantly," but depends upon a threshold that measures the relative difference (*i.e.*, a percentage) on a comparison-by-comparison basis where the threshold is calculated as plus or minus two percent of the weighted-average net prices to all other purchasers, regions, or time periods.  Because the difference between the weighted-average net price to a given purchaser, region, or time period and the weighted-average net price to all other purchasers, regions, or time periods is measured relative to the weighted-average net price to all other purchasers, regions, or time periods, the price difference test is not a brightline test.

ULMA argues that Commerce should effectively ignore "outliers" in the data and incorporate a means of accounting for "variability in the data."[52]  However, the purpose of the differential pricing test is to determine if there are any instances of masked dumping that the A-to-A method might not be able to account for.  The A-to-A method, whether based on period-wide or monthly weighted-average U.S. prices, will include both implicit and explicit offsetting of lower prices with higher prices.  Implicitly, within each weighted-average U.S. price the A-to-A method offsets lower prices with higher prices.  The A-to-T method eliminates implicit offsets through the use of individual U.S. prices rather than weighted-average U.S. prices.  Furthermore, explicitly in the A-to-A method, offsets for lower prices in one weighted-average U.S. price can be made by higher prices in a different weighted-average U.S. price.  Thus, if Commerce were to

---

[51] *See* ULMA's Draft Redetermination Comments at 19.
[52] *Id.* at 20-23.

ignore the "outliers" or somehow incorporate a method for taking into account "variability in the data" such that it only considered the mean or average, we would be effectively recreating the exact problem that the differential pricing analysis is intended to identify and application of the A-to-T method is meant to address.

Although there may be weighted-average sale prices that are above or below two percent of the weighted-average price of all other sales, the price difference test looks at whether the weighted-average sales price to one customer, region, or time period is above or below two percent of the weighted-average price of all other sales to determine whether prices differ significantly. Commerce then uses the ratio test to determine whether there is a pattern. If the extent of significant price differences constitutes evidence of a pattern, then that pattern indicates the potential for masked dumping. We further note that the Federal Circuit has sustained the ratio test as a reasonable interpretation of "a pattern" in section 777A(d)(1)(B)(i) of the Act.[53] ULMA does not offer any method for determining what would constitute an outlier, but rather merely implies that their alleged presence would distort the results. While ULMA essentially argues we should only look to the "mean values," doing so would recreate the masking that can occur when relying on the A-to-A method.[54] Higher prices would still be permitted to offset lower, dumped prices.

Finally, ULMA argues that Commerce carrying out individual tests for whether prices vary across each category (purchasers, regions, or time periods) "triples the likelihood" that a positive result will occur, and, thus, it "fails to correct for the 'family-wise' error."[55]

---

[53] *See Dillinger France*, 981 F.3d at 1325-26.
[54] *Id.* at 23 ("The small difference in the mean simply reflects the degree of variability in the underlying data{, and t}his example shows—both numerically and visually—that the difference is simply too small to be part of a 'pattern' or to be 'significant.'").
[55] *See* ULMA's Draft Redetermination Comments at 23-24.

Commerce's testing the significance of the price differences by each of these categories individually, where the results are aggregated in the ratio test, is consistent with the statute and is a reasonable method for determining whether prices differ significantly across purchasers, regions, *or* time periods. As discussed above, the Federal Circuit has held that Commerce's ratio test is reasonable. Further, if Commerce finds that a given sale price differs significantly by more than one category, *e.g.*, by purchasers and region, then the value of that sale is only counted once in the numerator of the ratio test. In other words, that sale's value is not double counted.

Furthermore, ULMA's argument relies on a flawed premise that Commerce "conducts three distinct tests for price *correlations*."[56] Commerce's price difference test does not look for statistical correlations. Instead, the price difference test determines whether the weighted-average net price to a given purchaser or region, or during a specific time period, falls outside of the plus or minus two percent band around the weighted- average net price of sales to all other purchasers, regions, or time periods. There is no multiple counting of the results. When Commerce aggregates the results of the price difference test in the ratio test to quantify the extent of the prices that differ significantly, Commerce eliminates the "overlap" where the price for an individual sale is found to differ significantly by more than one of the "multiple tests," *i.e.*, by purchaser, region, or time period. In other words, a passed sale will only count in the ratio test once. Thus, there is no possibility of counting the same sale more than once if it is found to be at a price that differs significantly. Commerce's price difference test is not a statistical analysis of sampled data where a "false positive" would indicate a violation of the null hypothesis. No inferences are drawn that the analyzed data is representative of an unknown value. As such,

---

[56] *Id.* at 24 (emphasis added).

ULMA's argument about "family-wise" error, which may be relevant to statistical correlation, is not applicable here.

For the above reasons, we continue to find that the framework carries out a case-by-case analysis that properly accounts for the facts of a given case, and further that the two percent threshold is an appropriate means of measuring whether prices differ significantly amongst purchasers, regions, or time periods.

## V.    FINAL RESULTS OF REDETERMINATION

In consideration of the Court's *Remand Order*, we have continued to use the price difference test as a part of the differential pricing analysis to determine whether prices differ significantly.  ULMA's estimated weighted-average dumping margin remains unchanged from the *Final Results* and the Draft Redetermination at 1.89 percent.  Upon a final and conclusive decision in this litigation, Commerce will issue appropriate instructions to U.S. Customs and Border Protection consistent with the final results of redetermination.

4/22/2026

X _____

Signed by: CHRISTOPHER ABBOTT

25