THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

ULMA FORJA, S.COOP.,

Plaintiff,

v.

UNITED STATES,

Defendant.

Court No. 24-00162

PUBLIC DOCUMENT

**DEFENDANT'S REPLY TO COMMENTS ON REMAND REDETERMINATION**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C., 20044
Tel: (202) 616-2228
Email: Tara.Hogan@usdoj.gov

OF COUNSEL:

PAUL THORNTON
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20230

September 21, 2026

Attorneys for Defendant

# TABLE OF CONTENTS

BACKGROUND ....................................................................................................2

I. Statutory Framework ....................................................................................2

II. The Federal Circuit Invalidates The Cohen's *d* Test In *Marmen III* .........................4

III. Commerce Changes Its Administrative Practice After *Marmen III* ..........................5

IV. Commerce Followed Its New Practice On Remand ................................................8

ARGUMENT ....................................................................................................9

I. Standard of Review ........................................................................................9

II. Commerce's Remand Results Comply With *Marmen III* and the Remand Order..10

III. Commerce's Adoption of Its Differential Pricing Practice Reasonably Implements the Statutory Directive and is Supported by Substantial Evidence.....10

A. The Statute Grants Commerce Discretion Under the Reasonableness Standard ....................................................................................11

B. Commerce's Price Difference Test Reasonably Found That Prices Differ Significantly..................................................................................16

C. ULMA's Argument that Commerce's Ratio Test Does Not Make the Price Difference Test Statutorily Compliant Misunderstands Commerce's Difference Pricing Methodology ..................................................19

D. Commerce Reasonably Relied on the Price Difference Test to Comply with its Statutory Obligations ...............................................................22

E. Commerce Lawfully Applied Its Differential Pricing Analysis in Evaluating ULMA's U.S. Sales Prices on Remand.............................................23

CONCLUSION....................................................................................................27

# TABLE OF AUTHORITIES

**Cases** **Pages**

*Apex Foods Private Ltd. v. United States*,
144 F. Supp. 3d 1308 (Ct. Int'l Trade 2016) .............................................................. 7, 25, 26

*Apex Frozen Foods Priv. Ltd. v. United States*,
862 F.3d 1337 (Fed. Cir. 2017)........................................................................................ 3, 4, 26

*Archroma U.S., Inc. v. United States*,
2026 U.S. App. LEXIS 23777 (Fed. Cir. 2026) ............................................................... 9

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
102 F.4th 1252 (Fed. Cir. 2024) ..................................................................................... 13, 14

*Bio-Lab, Inc. v. United States*,
776 F. Supp. 3d 1315 (Ct. Int'l Trade 2025) ................................................................. 14, 15

*BYD (H.K.) Co. v. United States*,
785 F.Supp.3d 1359 (Ct. Int'l Trade 2025) ................................................................... 13, 15

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938)............................................................................................................ 9

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966)............................................................................................................ 9

*Dillinger France S.A. v. United States*,
981 F.3d 1318 (Fed. Cir. 2020)........................................................................................ 19, 21

*Garg Tube Exports LLP v. United States*,
740 F.Supp.3d 1355 (Ct. Int'l Trade 2024) ................................................................... 14, 15

*Gov't of Canada v. United States*,
Court No. 23-00187, Slip Op. 26-82 (Ct. Int'l Trade July 22, 2026) ............................ 1, 18, 20

*Gundy v. United States*,
588 U.S. 128 (2019)........................................................................................................... 13

*Hanon Sys. Ala. Corp. v. United States*,
Ct. No. 24-00013, Slip Op. 25-94, 2025 Ct. Intl. Trade LEXIS 96 at *14 (July 21, 2025)...... 14

*JBF RAK LLC v. United States*,
790 F.3d 1358 (Fed. Circ. 2015)...................................................................................... 20, 26

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 11, 12, 16, 19

*MacLean-Fogg Co. v. United States*,
100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) .......... 9

*Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V. v. United States*,
Slip. Op. 26-111 (Ct. Int'l Trade Sept. 14, 2026) .......... 2, 12, 20

*Marmen Inc. v. United States*,
Court No. 20-00169, Slip Op. 26-62 (Ct. Int'l Trade June 15, 2026) .......... 12, 18, 20

*Marmen Inc. v. United States*,
134 F.4th 1334 (Fed. Cir. 2025) .......... 1, 5, 10, 12, 21

*Mid Continent Steel & Wire, Inc. v. United States*,
940 F.3d 662 (Fed. Cir. 2019) .......... 11

*Mosaic Co. v. United States*,
160 F.4th 1340 (Fed. Cir. 2025) .......... 9, 11, 13

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) .......... 9

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO*,
605 U.S. 168 (2025) .......... 9, 11

*SolarWorld Ams. Inc. v. United States*,
910 F.3d 1216 (Fed. Cir. 2018) .......... 23

*Strickland v. United States,*
423 F.3d 1335 (Fed. Cir. 2005) .......... 12

*Stupp Corp. v. United States*,
Slip Op. 26-113 (Ct. Int'l Trade Sept. 15, 2026) .......... 2, 12, 20

*Stupp Corp. v. United States*,
5 F.4th 1341 (Fed. Cir. 2021) .......... 3, 11, 19, 20, 21, 22

*Toyo Kohan Co., Ltd. v. United States*,
Court No. 24-00261, Slip Op. 26-54 (Ct. Int'l Trade May 22, 2026) .......... *passim*

*Union Steel v. United States*,
713 F.3d 1101 (Fed. Cir. 2013) .......... 2

*United States v. Lancaster*,
6 F.3d 208 (4th. Cir. 1993) .......... 14

*Universal Tube & Plastic Indus., Ltd, v. United States*,
Court No. 23-00113, Slip Op. 26-98 (Ct. Int'l Trade Aug. 19, 2026) .......... *passim*

*Ventura Coastal, LLC v. United States*,
736 F.Supp.3d 1342 (Ct. Int'l Trade 2024) .......... 14

**Statutes**

19 U.S.C. § 1516a(b) .......... 9

19 U.S.C. § 1673 .......... 2, 3

19 U.S.C. § 1673b(3) .......... 17

19 U.S.C. § 1673d(a)(4) .......... 17

19 U.S.C. § 1677a(a) .......... 2

19 U.S.C. § 1677f-1 .......... *passim*

19 U.S.C. §§ 1677a(a)-(b) .......... 2

28 U.S.C. § 2639(a)(1) .......... 9

**Regulations**

19 C.F.R. § 351.403(c) .......... 17

19 C.F.R. § 351.414(b) .......... 3, 24

19 C.F.R. § 351.414(c) .......... 3, 24

**Administrative Determinations**

*Alternatives to the Use of Cohen's d; Request for Comment*,
90 Fed. Reg. 21,277 (Dep't of Commerce May 19, 2025) ........................................................ 6

*Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*,
84 Fed. Reg. 26,401 (Dep't of Commerce June 6, 2019) ........................................................ 17

*Differential Pricing Analysis; Request for Comments*,
79 Fed. Reg. 26,720 (Dep't of Commerce May 9, 2014) .......................................................... 4

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*,
90 Fed. Reg. 30,050 (Dep't of Commerce July 8, 2025)........................................................... 6

*Welded Line Pipe from Korea*,
80 Fed. Reg. 61,366 (Dep't of Commerce Oct. 13, 2015)....................................................... 20

**Other Authorities**

Statement of Administrative Action,
H.R. Doc. No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 .................... 3, 14

THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | | |
|---|---|---|
| ULMA FORJA, S.COOP., | ) | |
| Plaintiff, | ) | |
| v. | ) | Court No. 24-00162 |
| UNITED STATES, | ) | |
| Defendant. | ) | |

**ORDER**

Upon consideration of the Department of Commerce's final results of redetermination pursuant to remand, ECF No. 31, all responses thereto, and all other pertinent papers, it is hereby ORDERED that the remand results are sustained in their entirety and judgment shall be entered accordingly in favor of the United States.

Dated: ___________________, 2026
New York, NY

_______________________________________
JANE A. RESTANI, JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | | |
|---|---|---|
| ULMA FORJA, S.COOP., | ) | |
| Plaintiff, | ) | |
| v. | ) | Court No. 24-00162 |
| UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO COMMENTS ON REMAND REDETERMINATION**

Defendant, the United States, respectfully submits this response to the comments submitted by plaintiffs ULMA Forja, S.Coop. (ULMA) (ECF No. 36) (ULMA Cmts.), concerning the Department of Commerce's remand redetermination. *See* Final Results of Redetermination (Apr. 22, 2026) (ECF No. 31) (P.R.R. 7)[1] (Remand Results). The sole issue presented is the lawfulness of the price difference test, a component of Commerce's differential pricing analysis, which Commerce adopted in response to the Federal Circuit's decision in *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) (*Marmen III*).

This Court has now addressed this issue in six decisions, each time sustaining Commerce's application of the price difference test as reasonable and lawful. *See Toyo Kohan Co., Ltd. v. United States*, Court No. 24-00261, Slip Op. 26-54 (Ct. Int'l Trade May 22, 2026); *Marmen Inc. v. United States*, Court No. 20-00169, Slip Op. 26-62 (Ct. Int'l Trade June 15, 2026) (*Marmen IV*); *Gov't of Canada v. United States*, Court No. 23-00187, Slip Op. 26-82 (Ct.

[1] "P.R." and "C.R." refer to public and confidential documents in the administrative record. References to the public and confidential documents on the administrative record for the remand redetermination are designated as "P.R.R." and "C.R.R.," respectively.

Int'l Trade July 22, 2026); *Universal Tube & Plastic Indus., Ltd, v. United States*, Court No. 23-00113, Slip Op. 26-98 (Ct. Int'l Trade Aug. 19, 2026); *Maquilacero S.A. de C.V. and Tecnicas de Fluidos S.A. de C.V. v. United States*, Slip. Op. 26-111 (Ct. Int'l Trade Sept. 14, 2026); *Stupp Corp. v. United States*, Slip Op. 26-113 (Ct. Int'l Trade Sept. 15, 2026) (*Stupp VIII*).

This Court should again find Commerce's price difference test to be reasonable and lawful. As we explain below, the remand redetermination complies with the remand order, is supported by substantial evidence, and is in accordance with law. Accordingly, we respectfully request that the Court sustain Commerce's remand redetermination and enter judgment in favor of the United States.

## BACKGROUND

### I. Statutory Framework

The Tariff Act of 1930, as amended, establishes a remedial regime to combat unfair trade practices. The Act's antidumping provisions provide relief for injury to domestic manufacturers by imposing duties upon imports of foreign products that are sold in the United States at less than fair value (LTFV). 19 U.S.C. § 1673. By statute, Commerce must evaluate whether imported products are sold in the United States at unfairly low prices. 19 U.S.C. § 1673; *see also Union Steel v. United States*, 713 F.3d 1101, 1103 (Fed. Cir. 2013). If Commerce concludes that the U.S. sales are "at {LTFV}" – meaning that the products are dumped into the U.S. market, and if the International Trade Commission concludes that a U.S. industry has been injured by such unfair pricing, then Commerce will direct U.S. Customs and Border Protection to assess an "antidumping duty." *Id.* A sale generally is at "{LTFV}" when the price charged in the U.S. market – the "U.S. price" – is less than the "normal value" (NV), generally the price charged in the comparison market. 19 U.S.C. §§ 1677a(a)-(b), 1677b(a)(l)(B)(i). The antidumping duty is

equal to the "amount by which the {NV} exceeds the {U.S. price} for the merchandise." 19 U.S.C. § 1673.

In determining whether subject merchandise is being sold at LTFV, Commerce normally compares "the weighted average of the {NVs} to the weighted average of the {U.S. prices} for comparable merchandise" unless it determines another method is appropriate. 19 U.S.C. § 1677f-1(d)(1)(A)(i); 19 C.F.R. § 351.414(c)(1). Under this average-to-average (A-A) method, Commerce compares the weighted average of a respondent's comparison market sale prices during the investigation period to the weighted average of the respondent's sales prices in the United States during the same period. 19 C.F.R. § 351.414(b)(1).

One downside of the A-A method is that it may fail to detect instances of "targeted" or "masked" dumping, which may occur when an exporter sells at a dumped price to some customers, regions, or time periods, while selling at higher prices to other customers, regions, or time periods. *See Stupp Corp. v. United States*, 5 F.4th 1341, 1345 (Fed. Cir. 2021) (*Stupp V*) (citing *Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1341 (Fed. Cir. 2017) (*Apex II*)). When Commerce uses the A-A method, higher-priced U.S. sales can mask these lower-priced U.S. sales that are dumped, which could potentially leave the domestic industry without a remedy from unfair trade practices. *See* Statement of Administrative Action (SAA), H.R. Doc. No. 103-316, vol. 1 (1994) at 842, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178 ("In part, the reluctance to use an {A-A} methodology has been based on a concern that such a methodology could conceal 'targeted dumping.' In such situations, an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions."). In an investigation, for example, if the full extent of dumping is masked, then the domestic industry may not receive the relief that the statute affords when the calculated

weighted-average dumping margin based on the A-A method falls below the two percent *de minimis* threshold.

Congress addressed this problem by enacting 19 U.S.C. § 1677f-1(d)(1)(B). *See Apex II*, 862 F.3d at 1342. Section 1677f-1(d)(1)(B) allows Commerce to compare "the weighted average of the {NVs} to {U.S. prices} of individual transactions {( *i.e.*, average-to-transaction (A-T))} for comparable merchandise if (i) there is a pattern of {U.S. prices} for comparable merchandise that differ significantly among purchasers, regions or periods of time, and (ii) {Commerce} explains why such differences cannot be taken into account using {the A-A method or transaction-to-transaction method}." 19 U.S.C. § 1677f-1(d)(1)(B)(i)-(ii).

Congress did not specify *how* Commerce was to determine whether there exists a pattern of prices that differs significantly among purchasers, regions, or time. Nor did Congress mandate that Commerce use statistical tests or techniques in determining if conditions specified in 19 U.S.C. § 1677f-1(d)(1)(B) exist. The SAA explains that Commerce should proceed "on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another." SAA at 843.

## II. **The Federal Circuit Invalidates The Cohen's *d* Test In *Marmen III***

Beginning in 2013, Commerce used the Cohen's *d* test in all antidumping proceedings to evaluate whether U.S. prices differ significantly within the meaning of 19 U.S.C. § 1677f-1(d)(1)(B). *See Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720, 26,722-23 & n.12 (Dep't of Commerce May 9, 2014) (citing six proceedings applying the Cohen's *d* test, including *Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 33351 (Dep't of Commerce June 4, 2013) (final AD determination), and accompanying Issues and Decision Memorandum (IDM) comment 3)). Commerce also used a ratio test to assesses the

extent of the significant price differences for all U.S. sales as measured by the price difference test. 79 Fed. Reg. at 26,722-23. If the Cohen's *d* test and the ratio test demonstrated the existence of a pattern of prices that differed significantly such that an alternative comparison method should be considered, then Commerce examined whether using only the A-A method can appropriately account for such differences. *Id.* at 26,723. In considering this question, Commerce determined whether using an alternative comparison method (such as the A-T method) yielded a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-A method. *Id.* Together, the Cohen's *d* test, the ratio test, and the meaningful difference test, comprised Commerce's differential pricing analysis, *id.*, until *Marmen III*.

In *Marmen III*, the Federal Circuit reviewed Commerce's application of the Cohen's *d* test as part of the agency's differential pricing analysis. The Federal Circuit held that "it was unreasonable to rely on Cohen's *d* test to determine whether prices differ significantly" when the underlying data did not satisfy certain statistical assumptions. *Marmen III*, 134 F.4th at 1348. The court further held that on remand, "Commerce may re-perform a differential pricing analysis, and that analysis may not rely on Cohen's *d* test for data sets like those here." *Id.*

**III. <u>Commerce Changes Its Administrative Practice After *Marmen III*</u>**

*Marmen III* had a profound effect on Commerce's practice, affecting hundreds of segments of antidumping proceedings. Consistent with 19 U.S.C. § 1677f-1(d)(1)(B), Commerce applies its differential pricing analysis to determine which comparison method –A-A or A-T – is appropriate. Because statistical assumptions discussed by the Federal Circuit in *Marmen III* are unlikely to be valid in exporters' pricing data, as a practical matter, the Federal

Circuit's decision to condition the use of the Cohen's *d* test on such assumptions, rendered the Cohen's *d* test unusable in antidumping proceedings.

Following *Marmen III*, Commerce changed its practice. First, Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under 19 U.S.C. § 1677f-1(d)(1)(B)(i), to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods. *Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277 (Dep't of Commerce May 19, 2025). To comply with the holding in *Marmen III*, Commerce discontinued the use of the Cohen's *d* test in antidumping proceedings and adopted the "price difference" test as the new test for determining whether price differences among purchasers, regions, or time periods are significant. *See, e.g.*, *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea*, 90 Fed. Reg. 30,050 (Dep't of Commerce July 8, 2025) (final results 2022-23 admin. review), and accompanying IDM at 2-5 (applying the price difference test for the first time). Concurrently with this change, Commerce also discontinued the use of the "mixed method" – a hybrid version of two available comparison methods (*i.e.*, A-A and A-T) – in antidumping proceedings, aligning its practice more closely with the statutory language.[2] In other words, Commerce has discontinued the use of the Cohen's *d* test and the "mixed method" as a matter of administrative policy for all its antidumping proceedings, and has introduced the price difference test to examine whether U.S. prices differ significantly.

---

[2] The relevant statutory provision does not reference the "mixed method," which Commerce used under the old practice, but rather authorizes Commerce to use the A-T comparison method if certain conditions are satisfied. 19 U.S.C. § 1677f-1(d)(1)(B) ("The administering authority *may determine* whether the subject merchandise is being sold in the United States at {LTFV} *by comparing the weighted average of the {NVs} to the {EPs} (or {CEPs}) of individual transactions* for comparable merchandise, if ….") (emphasis added).

Under Commerce's new practice, the differential pricing analysis operates as follows. In the first stage, the price difference test is applied to determine whether prices for comparable merchandise differ significantly. Remand Results at 10. Under the price difference test, "{i}f the weighted-average net price to the given purchaser, region or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions or time periods, then the prices to that given purchaser, region or time period are found to differ significantly and those sales to the given purchaser, region or time period pass the price difference test." *Id.*

Next, the ratio test assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the period of investigation or review. *Id.* If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the A-T method. *Id.* If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find evidence that a pattern of prices existed during the relevant period.[3] *Id.* at 10-11.

Finally, if both price difference test and ratio test demonstrate evidence of a pattern of prices that differ significantly such that the A-T method may be considered, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard A-A method and using the alternative A-T method. *Id.* at 11. If

[3] Masked dumping is more likely to occur where there is a pattern of prices that differ significantly as contemplated by the statute. *See Apex Frozen Foods Priv. Ltd. v. United States*, 144 F. Supp. 3d 1308, 1327 n.24 (Ct Int'l Trade 2016) (citing 19 U.S.C. § 1677f-1(d)(1)(B); SAA at 843).

the difference between the two calculations is meaningful, then this demonstrates that the A-A method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the A-T method may be appropriate. *Id.*

## IV. Commerce Followed Its New Practice On Remand

In December 2025, the Court granted the parties' request to remand this case for Commerce to consider an alternative methodology for analyzing whether there is "a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or period of time" under 19 U.S.C. § 1677f-1(d)(1)(B)(i), in conformity with *Marmen III*. Remand Order, ECF No. 24 at 1.

On remand, following its new practice, Commerce applied the "price difference" and "ratio" tests to ULMA's U.S. sales. Commerce found that 88.49 percent of the value of U.S. sales pass the price difference test. Because more than 33 percent of the total value of U.S. sales passed the price difference test, Commerce confirmed the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. Remand Results at 7 (citing ULMA Draft Redetermination Analysis Memorandum (Jan. 26, 2026) at 3 (C.R.R. 13)). Commerce determined that the A-A method does not account for the pattern of prices that differ significantly (which indicates that potential masked dumping may exist) because "there is a 25 percent relative change between the weighted-average dumping margin calculated using the {A-A} method and the weighted-average dumping calculated using the {A-T} method" where both rates are above the *de minimis* threshold. *Id.* at 6-7.

Applying the results of the differential pricing analysis overall, Commerce relied on the alternative comparison method based on the A-T method to all ULMA's U.S. sales to calculate

ULMA's weighted-average dumping margin. *Id.* Accordingly, Commerce calculated an estimated weighted-average dumping margin of 1.89 percent. *Id.* at 25 (unchanged from the final results and the draft redetermination).

## ARGUMENT

### I. Standard of Review

Commerce's decisions are "presumed to be correct." 28 U.S.C. § 2639(a)(1). Following a remand, the Court will sustain Commerce's redetermination if it is "in accordance with the remand order," and is "supported by substantial evidence, and otherwise in accordance with law." *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The possibility of drawing inconsistent conclusions from the record does not prevent Commerce's finding from being supported by substantial evidence. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Thus, the substantial evidence standard is a "high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

Moreover, "'when an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's {(APA)} deferential arbitrary-and-capricious standard.'" *Mosaic Co. v. United States*, 160 F.4th 1340, 1346 (Fed. Cir. 2025) (quoting *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO*, 605 U.S. 168, 179-80 (2025)); *see also Archroma U.S., Inc. v. United States*, 2026 U.S. App. LEXIS 23777 (Fed. Cir. 2026).

## II. Commerce's Remand Results Comply With *Marmen III* and the Remand Order

This Court remanded this case for further proceedings in conformity with *Marmen III*. In *Marmen III*, the Federal Circuit held that "it was unreasonable to rely on Cohen's *d* test to determine whether prices differ significantly when the underlying data is not normally distributed, equally variable, and equally and sufficiently numerous." *Marmen III*, 134 F.4th at 1348. Additionally, the Federal Circuit held that "{o}n remand, Commerce may re-perform *a* differential pricing analysis, and that analysis may not rely on Cohen's *d* test for data sets like those here." *Id.* (emphasis added). That is exactly what Commerce did on remand here.

Following its new practice, Commerce performed *a* differential pricing analysis – without relying on the Cohen's *d* test. Final Remand Results at 2 ("Commerce has recalculated ULMA's estimated weighted-average dumping margin by … conducting Commerce's differential pricing analysis *without reliance on the Cohen's d test*") (emphasis added).

While ULMA challenges Commerce's price difference test as inconsistent with the statute and congressional intent, as well as unreasonable in application, ULMA Cmts. 1-3, ULMA does not dispute that Commerce's remand results are consistent with the remand order and the instructions in *Marmen III*. Below, we demonstrate that Commerce's remand results are lawful and reasonable, and should be sustained.

## III. Commerce's Adoption of Its Differential Pricing Practice Reasonably Implements the Statutory Directive and is Supported by Substantial Evidence

Commerce lawfully applied its revised differential pricing analysis in evaluating ULMA's U.S. sale prices. As this Court has now held six times, Commerce's differential pricing analysis is consistent with the statute and Federal Circuit precedent. As we explain below, this Court should do so again here.

**A. The Statute Grants Commerce Discretion Under the Reasonableness Standard**

ULMA challenges Commerce's differential pricing analysis as a misinterpretation of its statutory obligation. ULMA Cmts. at 7-8. ULMA further claims that *seve* requires this Court to determine if Commerce's differential pricing analysis is in accordance with the best reading of 19 U.S.C. § 1677f-1(d)(1)(B). *Id.* at 5 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)).

Where the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court is simply to ensure that "the agency engaged in reasoned decision making" within the boundaries of delegated authority. *Loper*, 603 U.S. at 395 (internal quote marks omitted). "'{W}hen an agency exercises discretion granted by a statute, judicial review is typically conducted under the {APA's} deferential arbitrary-and-capricious standard.'" *Mosaic*, 160 F.4th at 1346 (quoting *Seven County*, 605 U.S. at 179-80). "'Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained.'" *Id.* (quoting *Seven County*, 605 U.S. at 180).

The appropriate standard of review for Commerce's differential pricing analysis is reasonableness. *See Stupp V*, 5 F.4th at 1353 ("Our precedents make clear that the relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness, not substantial evidence.") (citing *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 667 (Fed. Cir. 2019)).

ULMA argues that *Stupp V*'s use of the reasonableness standard carries precedent only in a pre-*Loper* world.[4] *Loper* did not eliminate the reasonableness standard, which the Federal

---

[4] *Stupp V* does not even reference, let alone rely on, *Chevron*. *Stupp V*, 5.4th 1341. Moreover, even if it did, the Supreme Court has explained that past decisions relying on deference to the

Circuit applied to review Commerce's differential pricing analysis in *Stupp V* and *Marmen III* and this Court has applied in the six cases that have subsequently sustained Commerce's price difference test. In *Marmen III*, issued after *Loper*, the Federal Circuit continued to review Commerce's differential pricing analysis through the lens of reasonableness. 134 F.4th at 1345 ("{T}his case begins where *Stupp {V}* ended – Was it *unreasonable* for Commerce to use {the} Cohen's *d* test as part of its differential pricing analysis.") (emphasis added). It was indeed because the Federal Circuit found Commerce's application of the Cohen's *d* test to be "unreasonable" that it remanded the case, prompting Commerce's revised methodology. *Id.* at 1348. The Federal Circuit's use of the reasonableness standard in *Marmen III* –post-*Loper*– demonstrates that *Loper* has not changed the standard for reviewing Commerce's differential pricing analysis. *Id.*; *see Loper*, 603 U.S. at 412 (noting that *Loper* "do{es} not call into question prior cases that relied on the *Chevron* framework").

That there is no serious debate as to the Court's analysis is confirmed by this Court's recent review Commerce's revised differential pricing analysis using the same reasonableness standard. *See Universal*, Slip Op. 26-98 at 18 (citing *Stupp V* and stating "{t}he relevant standard for reviewing Commerce's selection of statistical tests and numerical cutoffs is reasonableness"); *accord Toyo*, Slip Op. 26-54; *Marmen IV*, Slip Op. 26-62; *GOC*, Slip Op. 26-82; *Maquilacero*, Slip Op. 26-111; *Stupp VIII*, Slip Op. 26-113.

---

agency remain good law, as they "are still subject to statutory stare decisis despite the Court's change in interpretive methodology." *Loper*, 603 U.S. at 412. This Court is, in any event, bound by Federal Circuit precedent. *See Strickland v. United States,* 423 F.3d 1335*,* 1338 n.3 (Fed. Cir. 2005) (stating that "a trial court may not disregard its reviewing court's precedent . . . {unless} the circuit's precedent is expressly overruled by statute or by a subsequent Supreme Court decision").

ULMA claims that this Court should afford no weight to these decisions because the court merely "reacted to the more limited specific arguments" and have yet to "offer its own best interpretation of the statute." ULMA Cmts. at 19. However, ULMA fundamentally misunderstands the basis for the courts' use of the reasonableness standard. The continued use of the reasonableness standard for reviewing Commerce's differential pricing analysis is based on the language of the statute itself. The statute, 19 U.S.C. § 1677f-1(d)(1)(B)(i), uses general statutory language to grant Commerce flexibility and discretion when assessing the need for an A-T comparison method. "Because the text and legislative history of this subsection of the statute confirm that Congress intended that Commerce have discretion in making the relevant determination, the Federal Circuit's holding in *Stupp {V}* is undisturbed by the Supreme Court's holding in *Loper*." *Toyo*, Slip Op. 26-54 at 16 n.12. When an agency exercises discretion granted by a statute, judicial review is typically conducted under a deferential standard. *Mosaic*, 160 F.4th at 1346. "'Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained.'" *Id.*

Administrative discretion may be built into a statute through the use of general statutory language.. ("Broad and open-ended grants of authority … are incapable of precise definition not because they are ambiguous, but because they unambiguously convey discretion."). *BYD (H.K.) Co. v. United States*, 785 F. Supp. 3d 1359, 1377 (Ct. Int'l Trade 2025). "By using nonspecific statutory language, Congress invokes its 'ability to delegate power under broad general directives.'" *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1259 (Fed. Cir. 2024) (*Asemesa*) (quoting *Gundy v. United States*, 588 U.S. 128, 147 (2019)). When, through the use of general terms, the statute unambiguously grants

administrative discretion, this Court has applied a reasonableness standard of review. *See BYD*, 785 F. Supp. 3d at 1377.

This Court has identified the term "significant" as an "indefinite term" that grants Commerce flexibility in developing methodologies.[5] *Bio-Lab, Inc. v. United States*, 776 F. Supp. 3d 1315, 1329 (Ct. Int'l Trade 2025) ("Indefinite terms like 'appropriate,' 'comparable' and 'significant' in the statute permit Commerce flexibility in evaluating potential surrogate countries.") (citing *Ventura Coastal, LLC v. United States*, 736 F.Supp.3d 1342, 1356 (Ct. Int'l Trade 2024)); *see also Hanon Sys. Ala. Corp. v. United States*, 794 F. Supp. 1346, 1356 (Ct Int'l Trade 2025), Ct. No. 24-00013, Slip Op. 25-94, 2025 Ct. Intl. Trade LEXIS 96 at *14 (July 21, 2025) ("{*Loper*} makes clear that Congress may 'leave {} agencies with flexibility' by using open ended terms such as 'reasonable' or 'appropriate.'")) (citations omitted).

The provision at issue is written in general terms that leaves open-ended the method by which Commerce assesses whether a "pattern" exists and whether prices differ "significantly." This indicates that Congress "intended to delegate the question of whether particular facts satisfy the statute's requirements to Commerce." *Asemesa*, 102 F.4th at 1259. This Court applied this same reasoning in *Garg Tube Exports LLP v. United States*, 740 F. Supp. 3d 1355 (Ct. Int'l Trade 2024) when addressing the statutory requirement that there be a pattern of prices that "differ significantly." In *Garg Tube*, this Court held that "{t}he text of the statute and its legislative history indicate that Congress gave Commerce flexibility by its use of the open-ended term 'differ significantly.'" 740 F. Supp. 3d at 1366-67. As the Court explained, "Congress'

[5] Courts have reached similar conclusions in interpreting the term "significant" as used in other laws. *See, e.g., United States v. Lancaster*, 6 F.3d 208, 210 (4th. Cir. 1993) (observing that term "significant injury, as used in the Sentencing Guidelines, "by its open-ended nature, cannot be defined with exactitude").

mandate to Commerce to assess not merely whether prices differ, but whether they differ 'significantly' necessarily affords Commerce flexibility to assess the degree of difference depending on the particular context." *Id.* at 1367. The Court added that the SAA provides that Commerce will proceed on a case-by-case basis, confirming the flexibility provided by the words of the statute. *Id.* (citing SAA at 843). Finally, the Court explained that the context in which the phrase "differ significantly" appears, alongside the subsection that allows Commerce to decline taking into account insignificant adjustments, 19 U.S.C. § 1677f-1(a), and another subsection that exclusively allows Commerce to select averages and statistically valid samples, 19 U.S.C. § 1677f-1(b), further confirms that Congress meant to afford Commerce with flexibility and discretion. *Id.* Therefore, the Court held that "Congress delegated to Commerce the power to use its discretion when determining whether prices differ significantly under 19 U.S.C. § 1677f-1." *Id.*

While conceding that *Garg Tube* supports this understanding of the term "differ significantly," ULMA contends that *Toyo*'s reliance on *Garg Tube* was a mistaken interpretation of the meaning of differ significantly within the statute. ULMA Cmts. at 19-21 (citing *Toyo*, Slip Op. 26-54 at 16 n.12, 20 (citing *Garg Tube*)). However, as explained above, this Court has separately found "significant" to be an "indefinite term" which grants Commerce discretion outside the context of 19 U.S.C. § 1677f-1(d)(1)(B). *Bio-Lab*, 776 F. Supp. 3d at 1329 (finding the statutory term "significant" grants Commerce "flexibility in evaluating potential surrogate countries."). *Garg Tube*'s interpretation of the statute's terms was therefore consistent with this Court's understanding of the term "significant" or "significantly" as the general statutory language that delegated to Commerce flexibility to fashion an appropriate methodological approach.

In sum, although courts must "determine the best reading of the statute and resolve the ambiguity," *Loper*, 603 U.S. at 400, "{i}t will sometimes be the case that 'the best reading of a statute is that it delegates discretionary authority to an agency.'" *BYD*, 785 F. Supp. 3d at 1377 (quoting *Loper*, 603 U.S. at 395). ULMA's argument that this Court must find the best reading of the statute in determining if Commerce's differential pricing analysis comports with its statutory obligation ignores both the statutory language and prior precedent.

**B. Commerce's Price Difference Test Reasonably Found That Prices Differ Significantly**

ULMA contests the use of Commerce's first step in its differential pricing analysis, the price difference test. *See* ULMA Cmts. at 7. According to ULMA, the price difference test "reflects an unlawful interpretation" of 19 U.S.C. § 1677f-1(d)(1)(B). *Id.* Specifically, ULMA contends that the price difference test misinterprets the terms "differs significantly" and "pattern" as enumerated in 19 U.S.C. § 1677f-1(d)(1)(B)(i). *Id.* at 8-11. Despite recognizing this Court's recent decisions upholding the price difference test, ULMA nevertheless implores it to ignore these prior decisions. *Id.* at 17-21. The Court should continue to uphold the test here.

The price difference test is step one of Commerce's differential pricing analysis and serves to determine only whether prices differ significantly. Under the price difference test, Commerce:

> examines whether the weighted-average net price to a given purchaser, region, or time period is within two percent of the weighted average net price to all other purchasers, regions, or time periods. If the weighted-average net price to the given purchaser, region, or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions, or time periods, then the prices to that given purchaser, region, or time period are found to differ significantly and those sales to the given purchaser, region, or time period pass the price difference test.

Remand Results at 5-6. Commerce stated that the price difference test is a "reasonable threshold to determine measure of significance." *Id.* at 12. In support of this interpretation, Commerce explained that a two percent threshold is also used to measure significance in the arm's-length test conducted pursuant to 19 C.F.R. § 351.403(c). The arm's-length test determines whether sales prices made by a respondent to an affiliated party in the comparison market are made in the ordinary course of trade, and, therefore, usable in Commerce's margin calculations. *Id.* at 12-13. Commerce explained that a two percent threshold is also found to be significant within the context of 19 U.S.C. § 1673b(3) and 19 U.S.C. § 1673d(a)(4) when determining whether a dumping margin is *de minimis*. *Id.* at 13.[6]

Ignoring Commerce's analogy to the two percent threshold in arm's-length test entirely, ULMA criticizes the statutory two percent threshold used in finding significant, non-*de minimis* margins. ULMA Cmts. at 10. First, ULMA states that *de minimis* is not the same as significant. *Id*. However, in applying the statutory *de minimis* threshold, Commerce routinely refers to non-*de minimis* levels of dumping as a "significant amount of dumping." Remand Results at 13 (citing *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 84 Fed. Reg. 26,401 (Dep't of Commerce June 6, 2019), and accompanying IDM at comment 2 ("Under scenario (4), there is a significant (*i.e.*, non-*de minimis*) amount of dumping") (*Pipe from Korea*).[7] Commerce explained that if a two percent difference between U.S. price and NV is sufficient to make an affirmative finding of sales at LTFV, which could lead to the imposition of the order and

[6] Indeed, as Commerce explained, the *de minimis* threshold in an administrative review is one half of one (*i.e.*, 0.5) percent, suggesting that a two percent threshold is a more conservative assessment of significance. *Id.* at 14.

[7] In addition to *Pipe from Korea*, Commerce has referred to a "non-*de minimis*" amount of dumping as a "significant" amount of dumping in at least 25 other final determinations during the past ten years in the context of both investigations and administrative reviews.

collection of antidumping duties, then it is **reasonable** to conclude that a two-percent price difference is significant in the context of 19 U.S.C. § 1677f-1(d)(1)(B). Remand Results at 13.

Second, ULMA contends that "differ significantly" is a "qualitative term that should be applied case-by-case" instead of through a fixed threshold. ULMA Cmts. at 10. However, the price difference test, like the arm's-length test and the *de minimis* threshold, does require a case-by-case assessment. It compares prices relative to the weighted-average net price to all other purchasers, regions, or time periods, based on the specific factual record. Remand Results at 21. Using a percentage to measure relative differences of the pricing data on the record of a particular case shows the price difference test adequately accounts for industry and product differences. *See Marmen IV*, Slip Op. 26-62 at 24-25 (finding that the price different test was applied on a case-by-case basis); *GOC*, Slip Op. 26-82 at 24-25 (same); *Universal*, Slip Op. 26-98 at 29 (same). As explained above and as this Court has held, two percent is a reasonable measure of significant price difference. *See Toyo*, Slip Op. 26-54 at 18-21; *Marmen IV*, Slip Op. 26-62 at 14-17; *GOC*, Slip Op. 26-82 at 16-19; *Universal*, Slip Op. 26-98 at 23.

Separately, ULMA argues that the price difference test does not find a pattern within the terms of the statute. ULMA Cmts. at 11-13. ULMA misunderstands the purpose of the price difference test. As step one of the differential pricing analysis, the price difference test does not attempt to determine a pattern; "the price difference test only examines whether prices differ significantly." Remand Results at 18; *see Toyo*, Slip Op. 26-54 at 14 (the "'price difference test determines whether prices differ significantly, and the ratio test determines whether there is a pattern'"); *accord Marmen IV*, Slip Op. 26-62 at 24; *GOC*, Slip Op. 26-82 at 24; *Universal*, Slip Op. 26-98 at 29. Step two, the ratio test, is responsible for determining the existence of a pattern. *See infra* Section III.C.

### C. ULMA's Argument that Commerce's Ratio Test Does Not Make the Price Difference Test Statutorily Compliant Misunderstands Commerce's Difference Pricing Methodology

The second step in Commerce's differential pricing analysis, the ratio test, addresses and implements the statutory requirement to determine whether a pattern exists. ULMA contends that, when applied to the results of Commerce's price difference test, the ratio test fails to identify a pattern within the meaning of the statute. ULMA Cmts. at 13, 22. In support of its view, ULMA first offers its own reading of the statute that conflates the first two steps of its differential pricing analysis and disallows the aggregation of results within groups. *Id.* at 22-23. Next, ULMA argues that the 33 percent used in the ratio test is arbitrary and does not account for randomness in pricing. *Id.* at 23, 39-40.

ULMA's argument directly conflicts with Federal Circuit precedent. The Federal Circuit has twice now sustained the use of the ratio test as a reasonable methodology for finding a pattern under the statute. *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1325-26 (Fed. Cir. 2020); *Stupp V*, 5 F.4th at 1355-56. ULMA asserts that *Dillinger* and *Stupp V* do not foreclose its arguments because both were decided before *Loper* and did not directly address the meaning of "pattern." ULMA Cmts. at 17-18. These arguments are unpersuasive for two reasons. First, *Stupp V* is still good law and "subject to statutory *stare decisis*." *Loper*, 603 U.S. at 412. Second, the Federal Circuit in *Stupp V* did not rely on *Chevron* deference. Rather, the court found the ratio test to be within Commerce's "discretion to determine a reasonable methodology to implement the statutory directive." 5 F.4th at 1354.

Additionally, ULMA's argument that *Stupp V* did not address the "broader question of the statutory requirements of a 'pattern'" is incorrect. ULMA Cmts. at 26-27. The Federal Circuit in *Stupp V* directly confronted the statutory language, including the "pattern"

requirement, in finding the ratio test to be consistent with the statute. The court observed that "there is no statutory language telling Commerce how to detect patterns of significantly differing exports prices, much less how to aggregate and quantify pricing comparisons across product groups in order to select a statutorily defined comparison method." 5 F.4th at 1354; *see Toyo*, Slip Op. 26-54 at 16 n. 12 ("Because the text {of 19 U.S.C. § 1677f-1(d)(1)(B)} and {the SAA} confirm that Congress intended that Commerce have discretion in making the relevant determination, the Federal Circuit's holding in *Stupp* {*V*} is undisturbed by the Supreme Court's holding in *Loper*"). *Stupp* and *Dillinger* resolve the issue of whether Commerce's ratio test is a reasonable method to implement the statutory requirement to find a pattern.

Moreover, this Court, as it must, followed the Federal Circuit precedent in recent cases and sustained Commerce's use of the ratio test to determine a pattern. *See GOC*, Slip Op. 26-82 at 19-22 ("The Court observes that the CAFC has previously upheld the 'ratio test' as a reasonable method for Commerce to implement the statutory requirement to determine whether there is a pattern.") (citing *Stupp V*, 5 F.4th at 1355); *accord Toyo*, Slip Op. 26-54 at 15-16, 18-19; *Marmen IV*, Slip Op. 26-62 at 17-21; *Universal*, Slip Op. 26-98 at 26; *Maquileacero*, Slip Op. 26-111 at 20-21; *Stupp VIII*, Slip op. 26-113 at 14-16.

Even if Commerce's ratio test had not been previously affirmed by the Federal Circuit, ULMA's arguments are unpersuasive. ULMA first notes that the ratio test does not find a pattern because it does not account for random isolated transactions occurring by chance. ULMA Cmts. at 12, 22-23 (citing *Welded Line Pipe from Korea*, 80 Fed. Reg. 61,366 (Dep't of Commerce Oct. 13, 2015), and accompanying IDM). "{R}equiring Commerce to determine the intent of a targeted dumping respondent 'would create a tremendous burden on Commerce that is not required or suggested by the statute.'" *GOC*, Slip Op. 26-82 at 18 n. 6 (quoting *JBF RAK*

*LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Circ. 2015)). Because the statute "does not require Commerce to determine the reasons why there is a pattern," Commerce need not ensure differences in prices were a product of purposeful targeted dumping before determining if a pattern exists. *Id.*, 790 F.3d at 1368. Moreover, whatever concern ULMA might have about random isolated transactions occurring by chance, in this case the pattern finding was not based on isolated transactions. Regarding ULMA's U.S. sales, Commerce concluded that "88.49 percent of the value of U.S. sales pass the price difference test, and {this} confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods." Remand Results at 7.

Next, ULMA contends that the statute does not permit Commerce to aggregate the results of the price difference test within groups of purchasers, regions, and time periods. Again, ULMA's argument runs contrary to precedent. The Federal Circuit has held that aggregation of sales across purchaser, region, and time period groups when comparing sales "is not inconsistent with the statute." *Dillinger*, 981 F.3d at 1325.

Finally, ULMA appears to argue that the statute requires Commerce to first find a pattern before assessing "other limitations on when that pattern is sufficient." ULMA Cmts. at 23. This argument finds no support in the statutory language. Further, in *Marmen III*, Federal Circuit held that "{o}n remand, Commerce may re-perform *a* differential pricing analysis, and that analysis may not rely on Cohen's *d* test for datasets like these." 134 F.4th at 1348 (emphasis added). Accordingly, *Marmen III* provides Commerce with latitude to reperform a differential pricing analysis so long as Commerce does not rely on Cohen's *d* test "when the test is applied to data sets that do not satisfy {its} statistical assumptions," but it does not impose the additional restrictions that ULMA advocates here. *Id.* at 1345; *see also Stupp V*, 5 F.4th at 1354 ("{T}here

is no statutory language telling Commerce how to detect patterns of significantly differing exports prices . . . . ). If, as ULMA suggests, Commerce was required to first determine the existence of a pattern, the statute would have contained the language specifying when and how Commerce must detect the existence of pattern. It does not.

**D. Commerce Reasonably Relied on the Price Difference Test to Comply with its Statutory Obligations**

ULMA claims that Commerce failed to consider alternatives to its price difference test. ULMA Cmts. at 24. ULMA argues that the Court may find Commerce's price difference test less reasonable when compared to alternative methodologies. *Id.* (citing *Toyo*, Slip Op. 26-54 at 18-19). This argument stems from a single sentence where this Court states that plaintiffs "shoot arrows at Commerce's price difference test but does not explain how the test may be improved or propose a meaningful alternative." *Toyo*, Slip Op. 26-54 at 18-19. That observation does not open the door for the Court to evaluate the merits of proposed alternative methodologies. Rather, "{w}hen reviewing Commerce's choice of methodology, the court considers whether the methodology reasonably implements a given statutory directive." *Toyo*, Slip Op. 26-54 at 18 (citing *Stupp V*, 5 F.4th at 1351) (internal quotations omitted). As this Court concluded, "Commerce's two percent price difference test reasonably implements {the statute}." *Id.*

Just like the plaintiff in *Toyo*, ULMA "shoot{s} arrows at Commerce's price difference test but does not explain how the test may be improved or propose a meaningful alternative." *Id.* at 19. ULMA repeats its litany of grievances with Commerce's current price difference test. *See* ULMA Cmts. at 24-26; ULMA Comments on the Draft Remand (Feb. 9, 2026) (P.R.R. 5) (ULMA Draft Remand Cmts.) at 13-24. Commerce squarely addressed each of ULMA's complaints. *See* Remand Results at 17-25. ULMA's complaints do not require Commerce to evaluate or rebut competing alternatives to Commerce's differential pricing analysis.

*SolarWorld Ams. Inc. v. United States*, 910 F.3d 1216, 1226 (Fed. Cir. 2018) (rejecting argument that Commerce was required to consider an alternative methodology, once it demonstrated that its methodological choice was reasonable and supported by substantial evidence). Even if Commerce had an obligation to consider and address all potential alternative methodologies, ULMA has failed to present any viable alternative options in this case.

### E. Commerce Lawfully Applied Its Differential Pricing Analysis in Evaluating ULMA's U.S. Sales Prices on Remand

ULMA further argues that Commerce's price difference test yields illogical results and is unreasonable as applied. ULMA Cmts. at 27-40. These arguments reveal ULMA's fundamental misunderstanding of Commerce's price difference test. ULMA seeks to impose the statistical requirements necessary for the application of the Cohen's *d* test to the price difference test, which is not a statistical test.

In arguing that the price difference test is unreliable when considering a small number of transactions, ULMA seeks to import the statistical assumption that transactions are sufficiently numerous from the Cohen's *d* test into the price difference test. The price difference test is not a statistical test and does not require the calculation of a standard deviation. *Compare* ULMA Cmts. at 30-32, *with* Remand Results at 18-19 (noting "there is similarly no such requirement in the arm's-length test that the sales of comparable merchandise to the affiliated customer or to all unaffiliated customers have a minimum number of sales"). Additionally, ULMA's concern about the application of the price difference test to a small number of transactions rings hollow, because Commerce applied the test to thousands of U.S. sales and 88.49 percent of total observations passed the price difference test. *See* Final Results of Redetermination U.S. Sales Margin Program at 3, 24-25 (Jan. 26, 2026) (C.R.R. 12).

Moreover, Commerce explained that "it is possible for there to be one sale to a particular customer, region, or within a particular time period the price of which is significantly different than the prices for all other sales." Remand Results at 19. Although here Commerce applied the test to thousands of U.S. sales, for some industries the relevant market could be limited to a small number of high value transactions (*e.g.*, large newspaper presses) and, thus, considering a small number of transactions would be appropriate in some contexts. ULMA failed to advocate for the use of the "transaction-to-transaction" method.[8]

ULMA's argument that the price difference test erroneously treats small and symmetrical differences from the mean as meaningful fails to demonstrate that Commerce's application of the price difference test is unreasonable. ULMA Cmts. at 32-36. As Commerce explained:

> {T}he two percent threshold is used as a measure of significance in other aspects of Commerce's margin calculations, including in the arm's-length test and the de minimis threshold for an estimated weighted-average dumping margin in an investigation. When the prices to an affiliated customer are not at arm's length, Commerce finds that such sales are outside of the ordinary course of trade. The distinction between being within or outside of the ordinary course of trade is a significant difference, as sales which are found to be outside the ordinary course of trade are excluded from Commerce's margin calculations, *e.g.*, excluded from the calculation of NV. Likewise, the two-percent threshold in an investigation determines whether the investigation results in an affirmative determination of sales at LTFV. If a weighted-average difference of two percent between U.S. prices and NV is significant enough to warrant an affirmative determination of sales at LTFV, then it is reasonable to conclude that a two-percent difference in U.S. prices—*the same U.S. prices that are used in comparison with NV*—is significant within the context of {19 U.S.C. § 1677f-1(d)(1)(B)(i)}.

Remand Results at 19-20. Additionally, in claiming that as "a matter of basic mathematics, some prices are higher than the average, and others are lower than the average," ULMA fails to

[8] We do not suggest that transaction-to-transaction method would have been appropriate on the facts of this case. The transaction-to-transaction method is limited to unusual situations where there are very few sales of subject merchandise. 19 C.F.R. § 351.414(b)(2) and (c)(2). Here, as explained earlier, Commerce applied the price difference test to thousands of U.S. sales.

address the issue of whether the differences between average prices among purchasers, regions and time periods are significant. In applying the price difference test, Commerce is only looking for whether prices differ significantly among purchasers, regions, or time periods by comparing the average of a test group to the average of a base group, consistent with its statutory directive. *Id.* 20-21. Commerce does not compare the price of an individual transaction against the average price of all sales that includes such transaction.

ULMA also argues that the price difference test is applied mechanically in every case the same way, regardless of the case-specific facts, citing "the extreme concentration in a single region" in this case "and the fact that prices varied considerably based on customer size." ULMA Cmts. at 36-37. However, Commerce's application of the price difference test to exporter-specific pricing data is necessarily case-specific. The statute requires Commerce to determine whether price differences among purchasers, regions, or time periods are significant. *See* 19 U.S.C. § 1677f-1(d)(1)(B)(i). If the average price for U.S. sales to a particular customer differs significantly from the average price to all other customers, the sales to that customer will pass the price difference test and will be found to differ significantly. Additionally, Commerce explained that:

> {The} "price difference test" examines whether the weighted-average net price to a given purchaser, region, or time period is within two-percent of the weighted-average net price to all other purchasers, regions, or time periods. Thus, whether the prices to a given purchaser, region, or time period differ significantly is determined relative to the weighted-average net price to all other purchasers, regions, or time periods. As a result, the data on which Commerce relies in performing the price difference test changes on a case-by-case basis, *i.e.*, specific to the respondent's pricing of comparable merchandise to all other purchasers, regions, or time periods, and Commerce's analysis therefore conforms with Congress' intent that an analysis of whether a pattern of prices exists be carried out on a case-by case basis.

Remand Results at 21-22.

ULMA contends that the statute does not allow Commerce to consider differences between average prices. ULMA Cmts. at 39. This Court rejected similar arguments. *See e.g.*, *Apex Foods Private Ltd. v. United States*, 144 F. Supp. 3d 1308, 1326 (Ct. Int'l Trade 2016) (*Apex I*) ("Although Congress did not modify 'export prices' with 'weighted-average' in the statute, Congress similarly decided not to modify 'export prices' with 'individual transactions' as it had done in other provisions of the antidumping duty statute."), *aff'd Apex II*, 862 F.3d 1337; *compare* 19 U.S.C. § 1677f-1(d)(1)(A)(i), *and* 19 U.S.C. § 1677f-1(d)(1)(B), *with* 19 U.S.C. § 1677f-1(d)(1)(B)(i). This Court held, "even if Congress intended for Commerce to establish that individual export prices differ significantly, it is not unreasonable for Commerce to fulfill that goal by looking to averages." *Apex I*, 144 F. Supp. 3d at 1326. ULMA's arguments do not compel a different conclusion.

Lastly, ULMA argues that that the price difference test uses an "unreasonably strict threshold." ULMA Cmts. at 3, 37-40. ULMA appears to suggest that certain regions or certain customers should be treated differently from others (and perhaps even excluded from analysis), if most sales are concentrated in a particular region or if the price depends on the size of a customer. *Id.* at 36-37. This argument, however, ignores that "Section 1677f-1(d)(1)(B) does not require Commerce to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods . . . ." *JBF RAK*, 790 F.3d at 1368. Moreover, excluding certain customers or regions from the analysis, because sales to them are priced differently, "would be effectively recreating the exact problem that the differential pricing analysis is intended to identify and {that the} application of the {A-T}

method is meant to address." Remand Results at 22 (explaining that the "{A-A} method, whether based on period wide or monthly weighted-average U.S. prices, will include both implicit and explicit offsetting" while the "{A-T} method eliminates implicit offsets through the use of individual U.S. prices rather than weighted-average U.S. prices").

**CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's remand redetermination and enter judgment in favor of the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C., 20044
Tel: (202) 616-2228
Email: Tara.Hogan@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

PAUL THORNTON
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20230

September 21, 2026

CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing DEFENDANT'S REPLY TO COMMENTS ON REMAND REDETERMINATION complies with the word count limitation set forth in Standard Chambers Procedures ¶ 2(B)(1)(b) because it contains 8,222 words.

/s/Tara K. Hogan
TARA K. HOGAN